Number 181911 Catherine Leone Nantume v. William P. Barr Good morning, Your Honors. My name is Melanie Shapiro. I represent Petitioner Ms. Nantume. I'm here with Harvey Kaplan, my co-counsel for the Greater Boston Legal Services. At this time, may I reserve two minutes for rebuttal? Yes. Okay. Thank you, Your Honors. This case is very straightforward. There are two issues before Your Honors today. The first is that the BIA abused its discretion when it issued a copyrighted petition. The second issue before Your Honors... Before you get to the second issue... Yes. The first issue is about the State Department Country Conditions Report. Yes, Your Honors. Okay. What is the requirement that the BOA explicitly mention each document that it reviews in its decision? Is there any such requirement? There is not a requirement that it mentions every document. Okay. And from what do you draw the inference that supports the allegation you make in your brief that the BIA didn't consider that document that was proffered to it? Yes, Your Honors. So in the Galea's case, it says that there must be sufficient particularity in the Board's decision regarding country conditions. No. There wasn't sufficient particularity... What is there in the 2017 State Department Country Conditions Report that contradicts anything that the Board said or that shows that the Board didn't consider it? Well, Your Honor, there is no meaningful comparison between what was available at the first motion to reopen in the 2013 report and the 2017... Oh, I agree with you that the Board didn't do a thorough comparison. All right? On the other hand, you haven't pointed out anything in the 2017 Country Conditions Report that would lead inexorably or convincingly to a finding that there had been a material change in country conditions. I mean, if all that a document is is more of the same, you know, I wouldn't expect a fact finder to engage in an elaborate analysis of it. Well, I ever so slightly disagree that there's nothing in the 2017 report, Your Honor. One of the changes that is a tipping point is that President Roosevelt removed the age limits on serving. So now there are no term limits. So this is the president that signed into law the Kill the Gays Bill, and he can serve indefinitely now. And that's a material change in country conditions as to your petitioner? The fact that a country has changed its eligibility requirements for how long a president can serve? Well, it's one of many things. It's not a linear connection. However, if you look at the ramping up since the passage of the Kill the Gays Bill, I understand that it's been a null. However, there's another bill that's pending that also criminalizes same-sex activity. Yeah, but same-sex activity, as the BIA pointed out, has been unlawful in Uganda since I think they said 1802. Yes, Your Honor. However, in recent years, there's been a ramping up and intensification. I know, but when you say in recent years, the main item that you've used to show that is the passage of this now annulled statute in 2014, which was a statute which was enacted while the petitioner's removal proceedings were still ongoing. However, she was not out at that time, which is a difference. No, but that's the comparison date that we have to look at for materially changed country conditions. I understand, Your Honor. Another change that I'd like to know is the NGO Bill. So now that she's back in Uganda, she's not able to get any support. There's no aid, there's no ability to organize, and that further muzzles the rights of the LGBT community and puts them at greater risk. Excuse me. You know, you throw these things out and then you scoot off to something else. I want to know what the level of connectivity has to be. In doing a changed country conditions analysis, what I'm used to seeing, and maybe it's not inevitable, is that if the petitioner goes back here, country conditions have changed in a way that become more hostile to someone who's of the plaintiff's ethnicity, of the plaintiff's sexual petitioner's ethnicity, sexual orientation, class, gender, whatever the protected characteristic is. Now it seems to me you're taking this a step further and you're saying that change, materially changed country conditions, can include changes that affect organizations that might, as part of their mission, be helpful to someone in the petitioner's position. And I'm not aware of any case law that makes that further step and says that sort of indirect change can be considered a material change in country conditions. Do you have any such case law that holds that? No, Your Honor. I don't believe so. But it goes to my second. Well, first, Your Honor, there wasn't a comparison between the 2013 and the 2017 State Department reports, or there's no mention of the contents of the letters available at the second motions we opened that were not available at the first. There's no mention of Dr. Wheeler's very extensive psychiatric evaluation, which discusses this change. And this goes to the second point, which is that we're arguing that the board should have looked at country conditions in light of a non-self-induced personal change of Ms. Anthony coming out. In other circuits, they've looked at this in conjunction. And in this circuit, Your Honor, the Sioteng case had considered the public nature of evangelical Christians in Indonesia and ruled in favor of reopening that case because of the public nature. Yeah, but that was a much different case. That's a case that dealt directly with a proven characteristic of the alien, which the board simply had not considered at all against the backdrop where evangelical Coptic Christians were increasingly under fire in the country to which removal was suggested. We don't have anything like that here. The characteristic of the petitioner in this case, her sexual orientation, is something that has been treated very poorly in Uganda for years, indeed for centuries. And what the board has said is not that things are hunky-dory in Uganda, but that she's facing a continuation of bad conditions, not a material change in those bad conditions. So Sioteng, with all due respect and with some pride as the author of the opinion, I don't think helps you. Can I ask you a question? Yes, Your Honor. As I understand it, your client has been deported to Uganda. Is it in Uganda right now? Yes, Your Honor, she is in- How does that affect your case? Well, the Santana case says that this court continues to have jurisdiction. Thank you, Your Honor, for remanding the case. Is that the only way it affects it? Is there anything in the record about how she's being treated at this time in Uganda? Yes, Your Honor, I have not been able to... There's nothing in the record, but I personally have spoken to her family. I have been unable to get in touch with her directly. I did mention on WhatsApp about January that we were doing this case, and she was too afraid for me to send her a copy of it. So she's in hiding, and her U.S. citizen daughter remains here without a mother. Is there any motion to reopen the record by you? I'm sorry, I didn't hear you. Is there any way of reopening the record by you to include facts dealing with her condition after removal? I'm not sure about that, Your Honor. But if this court were to remand, we're not looking for a second bite at the apple here. We're looking for a first. She has not had an opportunity to present this Santana case in any court. We're just asking that we remand so the board can compare the evidence. The board can look at her non-self-induced change of coming out in light of the country conditions. One of the errors that we're alleging is that they should have looked at this in conjunction, and they didn't. And coming out has a big impact on how those country conditions would apply to her. I can give a little reference, a framework of how this came to be. I know you read the facts, and it's kind of a lot going on here. But I took this case in the end of June 2014. At that point, she hadn't come out to anybody except, of course, her girlfriend. And she didn't feel comfortable telling prior counsel, a white man, about who she was. She wasn't ready at that time. Excuse me, is this in the record? Yes, in my affidavit. And she came out to me, and then she asked me to tell her mother, who had a very hard time with it, which is also in the mother's affidavit. And at that point, we filed a motion to reopen. She hadn't come out to her mother yet, so we have limited evidence. And then with the second motion to reopen that we filed, that was she was planning imminent removal, and she realized if she was going to go back, she was going to face harm. And so we were able to get a lot more information than she had been out at that time. So that's a big change. And as I stated, she's in Uganda, and she's in high, and she's praying for life. And she can't even communicate with me. So we're just asking this court to remand so that she can have this opportunity. And this is kind of like the matter of SYG case. The Second Circuit found that the board hadn't done a proper job with the country conditions analysis. I want to ask you something. Yes. The law that was declared unconstitutionally in Uganda, what year was that? That was September 2014, and it was annulled only because there was not a quorum for the vote, not because of any political will. And as I mentioned, there is a bill pending that is similar, and it has a sentence of seven years imprisonment for same-sex activities. So it could be passed. Well, was this law that was declared invalid, was that before or after the State Department's latest state of the country condition report? The 2017 one? That was before the latest motion to an open country condition report, but it was after the first one. The law itself was passed while the removal proceedings were still pending. Correct, but before she – It was then invalidated the following year. The same year.  Yes. Thank you, Your Honors. Thank you, Your Honors. May it please the Court. I'm Scott Stewart on behalf of the Attorney General. In this case, the Board of Immigration Appeals denied Petitioner's second motion to reopen her immigration proceedings. That decision was correct. It was not an abuse of discretion. The Board of Immigration Appeals concluded correctly and reasonably  On that point, I'm sorry to interrupt your argument. On that point, the law that was declared unconstitutional, is that considered a change in government conditions? I think the declaration that a law would be unconstitutional could count as a change in country conditions, and my understanding, given the timing, is that that would have followed – postdated her last immigration hearing in May of 2014, Your Honor. Well, is it the very fact that they pass a law like that, even though it's declared later unconstitutional, a change in country conditions? It could be a change, Your Honor. The critical thing here, and I think Judge Cillia's question was getting at some of these points, is one, it's not a material change given just the long-standing history of the law. Not a material change? Not a material change, Your Honor. How long would you be imprisoned if you were found guilty for violation of that law? It imposed a life sentence, I believe, in some cases. Life sentence? Your Honor, again, invalidating – but the more critical point here, Your Honor, is that law came into effect before the end of Petitioner's initial removal proceedings. It was signed and took effect – I believe it was signed in February of 2014, and I think it took effect in, I want to say, May of 2014, and that was two months before her initial immigration proceedings concluded, Your Honor. So that there is – her lead argument is the 2014 – the Anti-Homosexuality Act of 2014, and because of the timing of that, it just doesn't work at the threshold as a changed circumstance in her favor. I think the overall point I want to emphasize here, Your Honor, is that – Well, do you know what would have happened if she had been out and had relied on the passage of that act? I'm not sure we know enough about what the effect of the act would have been, Your Honor. We just – we don't really have numbers in the record on – numbers in the record showing changed conditions. I think the fundamental – Isn't that the point? I understand the chronological argument. What about the substance of the argument? I mean, I think just looking, Your Honor, at the numbers we do have, the numbers in the 2017 report, for example, indicate certainly mistreatment, but it's in the range or in the number of, I believe – and this is, I think, the key – some of the key material at page 158 of the record – 11 physical assaults, 14 arrests, canceled Pride Week, and those are some of the incidents of harassment. I don't understand what you're arguing. What I'm saying, Your Honor, is that – First you said you didn't know, but now you seem to be arguing that it would not have provided support for relief. What I'm saying, Your Honor, is that we don't have anything in the record to show that – we don't have something in the record that shows that the passage of that law constituted a material change in country conditions. Those numbers do not seem to be a significant spike. Again, I mean, the law had been annulled, so we don't know what else could have happened, but the fact is we just have an absence of evidence here. I think, Your Honor, what we have is – my friend does call up the BIA or says the BIA erred in not considering things at greater length, but the BIA did just as it was supposed to do here. The motion to reopen, Your Honor, the key argument that Petitioner presents, her motion to reopen argument, appears in less than four pages. This is at AR 43 to 46. I still don't feel I've got a – perhaps I didn't ask the question correctly. Would she have been granted relief if she had been out when she filed her petition initially? When she filed her motion to reopen, Your Honor? No, her petition. Oh, her application for – it's – we don't really know that, Your Honor, because she didn't apply for asylum in the initial run, so we don't – so one of the problems here is that we don't have a finding of, look, I personally will face this problem, the showing is strong enough, more likely – all those – not more likely, but a sufficient showing of asylum. Okay, so you have all of that now. Let's say she filed it then, the information that she's giving you now. I do want to be careful not to apply on something that wasn't ruled on below. Now, Your Honor, if I could – I'm just trying to understand whether the government has a position that she wouldn't have been eligible in any event, or she very likely would have been eligible. That's all I'm looking for. I guess we certainly wouldn't concede eligibility, Your Honor, here. We don't have – we just do not have a pervasive showing that she would have faced this kind of harm. We have episodes of mistreatment, but these were going on for a long time. We don't have large numbers. This is a different case from the numbers we see in a lot of other cases, Your Honor. Smith, for example, involved pretty – a rapid kind of escalation of conditions in Zimbabwe, a tripling of majority party sponsored terrorism. Your Honor is familiar with all that, I'm sure, but we just don't know. But I wouldn't concede eligibility for asylum is what I'm saying, Your Honor. As to the question of whether the Board provided an adequate explanation, the Board, when it's ruling on these things, Your Honor, it has to look to what the motion to reopen says. And here the Board gave a full and fair reading and treatment of what that said. Really, the key material here appears on pages 44 to 45. And these are pages that the Board itself cited. These are pages 9 to 10 of the motion. And pages 44 really mostly goes to just the change in personal circumstances. It's only on page 45, only about two-thirds of a page, where a petitioner really comes to focus on alleged change conditions. And there she points to the 2014 Act. She points to the NGO Act. And then she points to one page of Exhibit G. This is the first page of the country report that just lists, generally, that one of the continued human rights issues is mistreatment of LGBT individuals. The Board treated each of those and noted the problem with the 2014 Act. It said, look, the NGO Act, it creates issues for organizations, but it doesn't create problems for LGBT individuals individually, personally. It doesn't materially change conditions. And then the Court said, looking at all these incidents of, as the Court put it, violence attacks and other problems faced by LGBT individuals, and that's when the Board cited the country conditions exhibit, that doesn't show that these are change conditions rather than just a continuation of conditions. And the Board, that was completely reasonable. Just looking at those records, Your Honor, the petitioner doesn't really go, and I think this hits on some of the themes Judge Celia hit, there's just not much here to show a change of conditions and certainly not much to show a material change in conditions at all. It shows incidents of mistreatment that are continuing, but not the kind of material intensification that Tawadros and other cases show is necessary. I'd also just emphasize, Your Honor, that my friend emphasizes this Court's decisions in Aponte and in Katak, where this Court faulted the BIA in certain respects for not getting an adequate analysis. Those were very, very different circumstances, Your Honor. In Aponte, the Court pointed out the BIA's faulty analysis and said, look, the BIA pointed to four findings. Here are four things wrong with those findings. One was just a flat-out error. Others just pointed out other issues. Said the Board cited this one case for that discussion. That case wasn't on point. The Board failed to discuss this other very important case. Similarly in Katak, what happened there was the BIA was doing pretty much one of two things. It was crediting the IJ or the immigration judge when the immigration judge had relied on just a wrong legal authority, a discredited legal authority, or the BIA was reaching a finding that was, I believe in the words of this Court, was clearly contradicted by the record. Here what we have is a review of the 125 or so pages of exhibits with the motion to reopen. It indicates that there is continuing mistreatment following petitioner's final immigration proceedings, continuing mistreatment in Uganda, but there's nothing to establish that that's a material change in country conditions or something more than a continuation. I would emphasize those points, Your Honor. I'm happy otherwise to rest on the points in our brief and just emphasize that the Board did not use its discretion in noting that in this case, the petitioner simply did not carry her burden of showing material change in country conditions. All right. Thank you. Thank you, Your Honor. Your Honor, if I may, on page 22 of the government's brief, they state that there's a presumption that the BIA considered the State Department report. You cannot presume what the BIA considered. That's an error of law. Additionally, Your Honor asked if she had been out at the time of the initial hearing, would she have been granted asylum, and I would say confidently that she has established a prima facie case in her motion to reopen with what we have now based on her coming out. She does have a well-founded fear of removal. So I would be inclined to say, yeah, absolutely, at the time she would have had a viable case for asylum. And as I mentioned earlier, she's just looking for a person. What case law do you have about the effect of the coming out cutting in her favor? Right. So this is actually an issue of first impression before this court. Yeah, that's right. I thought, you know, I mean, I'm not unsympathetic to it, but there's a bothersome element to it since it's the alien who controls when she decides to come out. Yes. So it's unusual to let determinations like this rest on the timing of a fact that is within the alien's control instead of beyond her control. There's an instructive case, Your Honor, in the Ninth Circuit, a child of a beholder, which dealt with a religious conversion, and the court held that it is a legal error when the BIA renders ineligible a post-removal conversion, but the timing of the religious choice is not determinative of one's rights. Here, similarly, coming out is a process like converting to a religion. Okay. I get your point. Okay. Thank you, Your Honor. Thank you both.